ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Healtheon, Inc. | ) ASBCA No. 63145 |
| | ) |
| Under Contract No. W912P8-15-C-0024 | ) |

APPEARANCES FOR THE APPELLANT:     Larry W. Caudle, Jr., Esq.
                                    Jonathan J. Straw, Esq.
                                      Kraftson Caudle PLC
                                      McLean, VA

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
                                    Engineer Chief Trial Attorney
                                  Jacob S. Stephens, Esq.
                                    Engineer Trial Attorney
                                    U.S. Army Engineer District, New Orleans

OPINION BY ADMINISTRATIVE JUDGE WILSON

This appeal arises from a hurricane protection project in Jefferson Parish, Louisiana. Appellant, Healtheon, Inc. (Healtheon or appellant), challenges the contracting officer's denial of its claim for additional compensation and time extensions in connection with directed changes and differing site conditions it allegedly encountered during contract performance. The Board conducted a six-day hearing in New Orleans, Louisiana. For the reasons stated below, the Board grants appellant one additional day in time extensions and denies the remainder of the appeal.

FINDINGS OF FACT

***The Contract, Modifications, and Claim Issues***

1. On September 5, 2014, the New Orleans District of the U.S. Army Corps of Engineers (USACE or Corps) issued Solicitation No. W912P8-14-R-0041 for a hurricane protection project in Jefferson Parish, Louisiana (project) (R4, tab 3 at COE000340).

2. Specifically, the project required the awardee to construct submersible electric pumps, diesel generators, fuel tanks, a pre-engineered metal building system (metal building), a concrete emergency shelter building (safehouse), and perform other related work (*id.* at COE000348-49).

3. On April 10, 2015, the Corps awarded Contract No. W912P8-15-C-0024 (contract) to Healtheon (*id.* at COE000165).

4. The contract incorporated by reference the following clauses from the Federal Acquisition Regulation (FAR): 52.233-1, DISPUTES (MAY 2014); 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); and 52.236-8, OTHER CONTRACTS (APR 1984) (R4, tab 3 at COE000184). The contract also incorporated the full text of FAR 52.243-4, CHANGES (JUN 2007) (*id.* at COE000197).

5. Healtheon segmented the project into three phases of work:

    a.      Phase 1: Primary installation of the platform piling and re-grading of existing and new rip-rap stone;

    b.      Phase 2: Construction of the platform, installation of the generator building, and demolition and replacement of the first three of seven electric pumps;

    c.      Phase 3: Demolition and replacement of the remaining four pumps, installation of the emergency shelter building, installation of the jib crane and removal of equipment from the existing platform, general building finishes, and final site work.

(Joint Statement of Undisputed Material Facts (JSUMF) ¶ 4)

6. In accordance with the contract, appellant was required to "commence work . . . within 10 calendar days after the date [Healtheon] receives the notice to proceed . . . [and] complete the entire work ready for use not later than 363 [calendar days]" (R4, tab 3 at COE000185). USACE issued the notice to proceed on April 30, 2015 (app. supp. R4, tab 2). Given this, appellant was required to complete performance by April 27, 2016 (*id.*; R4, tab 3 at COE000185).

7. The contract also noted that the 363 days allotted for project completion reflected the government's best estimate of the shortest reasonable performance period, and that appellant was obligated to do whatever was necessary, including hiring multiple crews, working overtime, and overseeing concurrent operations, to complete the work within the allotted time period without equitable adjustment (R4, tab 3 at COE000185).

8. Throughout contract performance, the government issued 13 modifications to the contract. In accordance with these modifications, the contract completion date was extended 63 days to June 29, 2016 (R4, tabs 6-8, 16-17).

2

9.  The table below summarizes the content of the modifications for the project.

| Mod No. | Mod Date | Description | Change in Contract Time | Change in Contract Price | Rule 4 Tab |
|---|---|---|---|---|---|
| A0001 | 10/19/2015 | Rip-Rap Differing Site Condition | 0 | NTE $30,000.00 | 5 |
| A0002 | 3/23/2016 | Weather Days: 4/30/15 - 9/30/15 | 3 | $0.00 | 6 |
| A0003 | 5/13/2016 | Weather Days: 10/1/15 - 12/31/15 | 7 | $0.00 | 7 |
| A0004 | 7/11/2016 | Weather Days: 1/1/16 - 4/30/16 | 6 | $0.00 | 8 |
| A0005 | 6/14/2016 | Fuel Vents & Piping Changes | 0 | NTE $8,500.00 | 9 |
| A0006 | 11/15/2016 | Rip-Rap in Berm Differing Site Condition | 0 | $102,687.08 | 10 |
| A0007 | 11/2/2016 | Electrical Modifications/Changes | 0 | NTE $65,000.00 | 11 |
| A0008 | 12/14/2016 | Contaminated Soil Differing Site Condition | 0 | NTE $5,000.00 | 12 |
| A0009 | 5/19/2017 | Gantry Crane Change | 0 | NTE $0.00 | 13 |
| A00010 | 8/11/2017 | Louver Screens Change | 0 | $23,006.76 | 14 |
| A00011 | 8/21/2017 | Pipe Piles & Rip-Rap Quantity Variations | 0 | -$60,695.82 | 15 |
| A00012 | 6/7/2018 | CLIN 0023 Gantry Crane Change | 0 | -$9,730.33 | 16 |
| A00012 | 6/7/2018 | CLIN 004 480V/Wiring Trough & Disconnect Switches | 12 | $0.00 | 16 |
| A00012 | 6/7/2018 | CLIN 0018 Fuel Vents & Piping Changes | 5 | $26,410.99 | 16 |
| A00012 | 6/7/2018 | CLIN 0011 Electrical Modifications/Changes | 7 | $86,250.78 | 16 |
| A00012 | 6/7/2018 | CLIN 0014 Contaminated Soil Removal (Differing Site Condition) | 1 | $9,207.13 | 16 |

| A00013 | 8/30/2018 | Weather Days: 5/1/16 - 3/20/17 | 22 | $0.00 | 17 |
|---|---|---|---|---|---|
| | | **Totals** (excluding undefinitized NTE amounts) | 63 | $177,136.59 | |

It should be noted that under Mod A00012, CLIN 004, USACE awarded 12 non-compensable additional days.

10. On June 10, 2019, USACE issued a letter stating that contract performance was complete. Specifically, the letter stated, "[a]ll contract work was performed in accordance with approved plans and specifications and meets the design criteria." (App. supp. R4, tab A26 at COE038653)

11. Complete performance required the completion of several[1] smaller construction and maintenance activities set forth within the specifications. These subprojects included: (1) metal building; (2) metal building louvers; (3) 480V service; (4) rip-rap; (5) crane; (6) fuel system piping; (7) electrical modifications; and (8) contaminated soil.

### *Metal Building*

12. Part of the project involved the procurement and erection of a metal building to house two generators that could operate the electric water pumps at the project site during an electrical outage. Section § 13 34 19 of the contract's specifications, *Metal Building Systems*, included the following relevant parts:

> 1.1 SCOPE
>
> The work covered by this section consists of furnishing all plant, equipment, labor and materials, and performing all operations in connection with the design, fabrication, transportation and installation of a metal building system (Generator Building) and appurtenances. Mechanical,

---

[1] There are two additional subprojects appellant completed to achieve complete performance for which it does not seek any damages or time extensions: the construction of an emergency shelter building and the provision of certain pumps and discharge pipes (R4, tab 1 at COE0000007, COE000076, COE000101; *see also* JSUMF ¶¶ 181-94). Because appellant does not seek any relief in connection with these items, the Board will not within this decision delve into the merits of any arguments appellant set forth for these subprojects.

electrical and plumbing components for the building are covered under the applicable mechanical, electrical and plumbing specification sections.

. . .

1.3 REFERENCES
The publications listed below form a part of this specification. . . .

AMERICAN SOCIETY OF CIVIL ENGINEERS (ASCE)
ASCE/SEI 7  (2010) Minimum Design Loads for Buildings and Other Structures, Including Supplement No. 1

. . .

METAL BUILDING MANUFACTURERS ASSOCIATION (MBMA) MBMA MBSM (2002) Metal Building Systems Manual

. . .

1.4 DESIGN REQUIREMENTS

1.4.1 Structural Performance

Provide metal building systems capable of withstanding the effects of gravity loads and the following loads and stresses within the limits and conditions indicated. Calculations and drawings shall be signed and sealed by a registered professional engineer.

. . .

1.4.1.2 Design Loads

Conform to the requirements of MBMA MBSM, ASCE/SEI 7, and the building code applicable to the project geographical location.

. . .

1.8 QUALITY ASSURANCE

. . .

1.8.4 Manufacturer's Qualifications

Metal building system manufacturer must . . . . [p]rovide engineering services by an authorized currently licensed engineer in the geographical area where construction will take place, having a minimum of four (4) years experience as an engineer knowledgeable in building design analysis, protocols and procedures for the "Metal Building Systems Manual" (MBMA MBSM); ASCE/SEI 7, the building code in the geographic area where the construction will take place and ASTM E 1592.

(R4, tab 3 at COE000944-956)

13. The above specifications incorporate by reference two different manuals: the Metal Building Manufacturers Association Metal Building Systems Manual (MBSM) and a manual issued by the American Society for Civil Engineers (ASCE) entitled Minimum Design Loads for Buildings and Other Structures. The MBSM describes a summary of the practices and responsibilities of the parties in a typical project involving a metal building. The ASCE manual "gives [the] criteria to determine whether or not a building should be classified as enclosed or partially enclosed" (tr. 2/31-32, 3/32).[2]

14. Healtheon subcontracted American Building Company (ABC) to fabricate the metal building (tr. 1/31).

---

[2] The parties did not provide the Board with a copy of the 2002 ASCE 7 referenced by the specifications, but appellant did provide a copy of the 2006 Metal Building Systems Manual (MBSM), which "focuses on how to apply the loads specified by . . . ASCE 7" and contains a large number of equations from the ASCE 7 manual regarding design loads (see app. supp. R4, tab A95 at 4, 40, 46-53).

15. On July 24, 2015, Healtheon received a purchase order from ABC (R4, tab 193 at COE058100). The purchase order classified the building as an Enclosed Building (*id.* at COE058107). We find no evidence in the record that calculations were done by either Healtheon or ABC to support the initial conclusion that the metal building would be fully enclosed (tr. 2/218-28).

16. In addition, although it is undisputed that Healtheon hired the engineering firm Waldemar Nelson Engineering to work with it on the project, the record evidence reveals that the firm did not review any of ABC's submittals (tr. 2/223-24).

17. On October 13, 2015, Healtheon transmitted the first set of metal building shop drawings to USACE (app. supp. R4, tab A6 at H00218).

18. On October 28, 2015, USACE rejected Healtheon's initial submittal and included the following comment to be addressed in a resubmission:

> On sheet ABC-1, the enclosure classification is labeled as "Enclosed." The eastern wall of this building contains one large opening (270 sq. ft.) that will remain open during a hurricane for air intake. This opening greatly exceeds the openings in the rest of the building, because the exhaust side will not be an "opening" as it is sealed off between the generator's radiator and wall. Per ASCE 07, this building would then be classified as "Partially Enclosed." Please revise.

(*Id.* at H00217)

19. Between January 4, 2016 and February 12, 2016, Healtheon realized that ABC's original anchorage design was fundamentally flawed (app. supp. R4, tab A6 at H00220-38, H00267-81, H00283).

20. On March 1, 2016, appellant submitted RFI-0024, in which it requested that the government review the structural design of the proposed building, specifically issues with the building slab and uplift loads (*id.* at H00286-87). In response, the Corps informed appellant that the problems highlighted in RFI-0024 did not rest with the slab, but "the loading applied to the anchorage" (*id.* at H00326, 329).

21. On March 22, 2016, Healtheon submitted to the Corps an alternative anchorage design using steel I-beams (app. supp. R4, tab A6 at H00357).

7

22. On March 31, 2016, the Corps returned the submittal with a C-code,[3] because the Corps sought clarification or confirmation of some design elements (app. supp. R4, tab A6 at H00377). Specifically, the Corps stated, "[t]his submittal is not a variation to the concrete platform but is a variation to the contract, in that the building system design is being changed" (*id.*).

23. By letter dated April 11, 2016, Healtheon contested the Corps' characterization of the alternative design as a variance and change to the metal building system. Specifically, appellant's letter stated that the "modification was made necessary by USACE's insistence on the nonexistent requirement that the metal building be classified as a 'partially enclosed' building and our effort to comply with the associated uplift requirements as explained in our letter 1503-L-0024 dated April 5, 2016." (App. supp. R4, tab A6 at H00381)

24. On April 13, 2016, Healtheon resubmitted a revised version of the anchorage design that was approved by the Corps on May 6, 2016 (app. supp. R4, tab A6 at H00399-400).

### *Metal Building Louvers*

25. The specifications require appellant to provide louvers[4] for the project, but the specifications contained contradicting information regarding the wind load the louvers were required to withstand.

26. Specifically, Specification § 08 91 00 sets forth requirements for metal wall louvers. Paragraph 2.2 of the specification required appellant to provide metal wall louvers "to withstand a wind load of not less than 140 pounds per square foot" (R4, tab 3 at COE000870).

---

[3] The Corps has a variety of codes it uses to respond to contractor submittals, all of which are associated with alphabet letter abbreviations. A C-code signifies that the submittal was approved, but a resubmission is required. (U.S. Army of Corps of Engineers, RMS Support Desk, *What Do the Submittal Codes Mean?*, https://rms.usace.army.mil/datafiles/helpvideos/qcsabout/Advanced/Content/Topics/FAQ_COM_2/What%20do%20the%20Submittal%20Codes%20Mean.htm (last visited March 3, 2025))

[4] The parties do not define the term "louver" within the record, but for the purposes of this decision, we find that louvers are sets of specialized vents that allow air to flow into a building while simultaneously blocking out rain and debris. *See* App. supp. R4, tab A300 at 61.

27.  Paragraph 2.8.7 of specification § 13 34 19 required certain louvers to be removable for maintenance.  Paragraph 2.8.7(e) required louver supports to carry "120 pounds per square foot wind load" (R4, tab 3 at COE000968).

28.  Contract Drawing No. M-022 stated that the louvers should be rated for 180 pounds per square foot (PSF) (R4, tab 4 at COE001316).

29.  On April 27, 2016, Healtheon submitted to the Corps RFI-0031.  In the RFI, appellant inquired how the specifications could simultaneously require appellant to provide louvers rated at 140 PSF while rating the building at 120 PSF and with drawings calling for a rating of 180 PSF (app. supp. R4, tab A6 at H00456).

30.  On May 5, 2016, the Corps responded that the "requirements for the doors and louvers shall be adhered to as stated in the plans and specifications" (*id.*).  The government ultimately accepted the louvers that appellant provided when the project was substantially completed on March 20, 2017 (R4, tab 65).

### *480V Service*

31.  Contract Drawing No. E-004 depicts an electrical system (480V overhead service system) servicing a specific sector gate on the project site (app. supp. R4, tab A6 at H00484).

32.  On February 3, 2016, Healtheon submitted to the Corps RFI-0021, alleging that the existing 480 overhead service system was not built in accordance with (1) Drawing No. E-004; (2) national power standards; or (3) local power company standards (*id.* at H00483; tr. 2/118-20).  Specifically, appellant asserted that the "meter . . . . is downstream (load side) of the service switch" rather than ahead of the service switch in accordance with Drawing No. E-004 (app. supp. R4, tab A6 at H00483).

33.  On March 10, 2016, USACE responded to RFI-0021 stating that the current set-up complied with contract standards and that if Healtheon still believed that there was a code violation, it needed to specify the exact code and requirement being violated (*id.*).

34.  On March 23, 2016, Healtheon re-submitted a portion of its concerns to the government in RFI-0026 (app. supp. R4, tab A6 at H00488).  In the resubmission, appellant stated that multiple changes were needed for the 480 service system to comply with articles 230.71 & 230.72 of the National Electric Code (NEC) (*id.*).  In its reply, the government conceded that disconnects were necessary downstream (*id.*).

9

35. On April 18, 2016, a USACE representative visited the site, agreed a change was necessary to correct the design, and discussed three possible solutions for appellant to consider (app. supp. R4, tab A6 at H00495-96).

36. On June 23, 2016, USACE issued a request for proposals (RFP) directing Healtheon to submit a cost proposal for new "wiring trough and disconnect switches to the existing 480 Entergy feeder to supply power to the new LP-S panel" (app. supp. R4, tab A6 at H00508). On June 30, 2016, Healtheon submitted a proposal (app. supp. R4, tab A6 at H00504).[5]

37. Thereafter, the Corps issued unilateral Modification No. A00012, which allowed $86,250.78 for electrical systems changes and extended the contract completion date by 12 non-compensable calendar days (R4, tab 16; finding ¶ 9).

### *Rip-Rap*

38. Rip-rap is a term of art used to describe a layer of large rocks that are used to protect soil and structures from water erosion (*see* tr. 1/105, 150, 2/13, 3/87, 4/71-72).

39. The contract included several technical specifications incorporating rip-rap. Specifically, sheet C-006 required the contractor to remove a single existing layer of 24" rip-rap from the project site (R4, tab 4 at COE001282; *see also* tr. 1/107 ("[e]specially the large stones absolutely would interfere with the pipe pile driving")).

40. In accordance with sheet C-002A, "ONLY [the] 20 FOOT SECTION [of rip-rap] SHOWN IS REQUIRED TO BE REMOVED FOR PILE DRIVING" (R4, tab 4 at COE001277) (capitalization in original).

41. On August 11, 2015, Healtheon began excavating the existing rip-rap and discovered that (1) the depth of the rip-rap was substantially greater than represented in the specifications and (2) the rip-rap extended underneath the berm (app. supp. R4, tab A6 at H00126; *see also* tr. 1/106-07 (stating that the contract required "minimal" rip-rap removal, but that the rip-rap appellant found "went well into the berm and . . . towards the flood wall")).

42. On August 18, 2015, USACE admitted that "[r]emoval of any of the stone on the protected side berm face, which is in the way of pile placement, would be reason for additional compensable work" (R4, tab 22). Thereafter, on September 14, 2015, USACE conceded that "additional work would be required to remove the rip rap

---

[5] The parties did not include a copy of appellant's proposal within the record, but it is undisputed that appellant submitted a proposal for $85,481.01 and 14 additional days to perform these tasks (JSUMF ¶ 104).

from the berm while maintaining the level of flood protection. . . ." (app. supp. R4, tab A6 at H00187).

43. On October 19, 2015, USACE determined that the rip-rap work constituted a differing site condition and issued unilateral Modification A00001 (app. supp. R4, tab A5 at H00189-90; *see also* R4, tab 2 at COE000146). Ultimately, over 1,200 tons of additional rip-rap were removed from the project site (app. supp. R4, tabs A157, A267, A300).

### *Crane*

44. Specification § 41 22 13.14 required Healtheon to provide an adjustable portable gantry crane[6] suitable for outdoor service. The specification also stated that the government would provide appellant with an electric-operated trolley that must be included within the lifting height (R4, tab 3 at COE001251; *see also* tr. 2/198).

45. On March 8, 2016, the Corps informed appellant that the contract would be modified because USACE would no longer provide a trolley. Instead, the government directed Healtheon to provide a manually operated trolley and chain hoist (app. supp. R4, tab A6 at H00723-26; tr. 2/199).

46. On June 9, 2016, USACE issued an RFP to "chang[e] the gantry crane from being electrically powered to chain operated" (app. supp. R4, tab A283 at H00728-29). Thereafter, the Corps issued a revised RFP specifying that appellant provide a "portable gantry crane" (app. supp. R4, tab A6 at H00750-53; *see also* tr. 2/207-08).

47. On April 5, 2017, Healtheon sent the government a proposal for $3,698.21. The proposal included a credit of $13,150 for the reduced cost of the manual gantry crane and an additional $16,086.01 for direct costs. (R4, tab 260 at COE57612-23)

48. On June 7, 2018, USACE finalized the gantry crane change order by issuing Modification No. A00012. The modification resulted in a net deduction of $9,730.33. (R4, tab 16 at COE001399; *see also* R4, tab 260 at COE57612-23)

---

[6] Specification § 41 22 13.14 does not define the term "portable gantry crane." But, Randy Persica, the Corps' administrative contracting officer, discussed the gantry crane in detail during his oral testimony. Specifically, he defined a gantry crane as a crane "that mounts . . . to the framework of the building . . . . suitable for lifting the largest piece of equipment inside the pump station for maintenance and repair." (Tr. 4/145)

## *Fuel System Piping*

49. Contract Drawing Nos. M-030, M-031 and S-026 contained designs for fuel tanks and related system piping for the project site (R4, tab 4 at COE001297, COE001317-18).

50. It is undisputed that in April 2016, the Corps changed its design for the fuel tanks and related system piping to avoid penetrating the concrete flood wall (JSUMF ¶ 158).

51. On April 27, 2016, Healtheon submitted RFI-0030, in which it informed USACE:

> Healtheon's fuel systems supplier has identified components missing from the existing tank modification scope, which would impede correct function based on the general fuel systems integration concept . . . . Healtheon recommends the addition of the float and integration into the new system, which will require engineering and installation supervision not included in the original scope.

(App. supp. R4, tab A6 at H00592)

52. On May 24, 2016, the Corps acquiesced to appellant's recommendations set forth in RFI-0030 (*id.*).

53. On June 10, 2016, the Corps issued Modification No. A00005, which rerouted the supply and return fuel piping over the top of the floodwall (app. supp. R4, tab A6 at H00600). Additionally, the Corps directed appellant to "delete" Contract Drawing Nos. M-030, M-031, and S-026 and replace said drawings with substitutes dated April 11, 2016 (*id.* at H00601).

54. On October 13, 2016, the Corps proposed additional adjustments to the system in revised Contract Drawing No. M-031 dated October 6, 2016 (app. supp. R4, tab A6 at H00612).

55. On October 28, 2016, the Corps requested that appellant provide a pricing proposal to "revise[] the location of the primary vents and to add foot valves to the day tank return pumps as detailed in DWG M-031, FILE NO. H-4-47769, Rev. 2 dated 10-6-16." The Corps issued this change directive with a not-to-exceed price of $8,500. (App. supp. R4, tab A6 at H00614)

56. On December 16, 2016, appellant submitted a revised pricing proposal informing the Corps that it would incur $48,973.67 for the directed fuel system piping changes (app. supp. R4, tab A6 at H00627, 639, 641).

57. On June 7, 2018, USACE issued unilateral Modification No. A00012 for $26,410.99 and extended the contract completion date by five non-compensable calendar days (app. supp. R4, tab A6 at H00677-79).

### *Electrical Modifications*

58. On September 30, 2016, Healtheon submitted RFI-0045, informing USACE that certain electrical equipment required by the contract was not certified by the manufacturer to meet contractually required wind pressure ratings. According to appellant, the only equipment that could be used required a different configuration and different electrical controls. (App. supp. R4, tab A6 at H00790)

59. On October 27, 2016, the Corps responded to RFI-0045 stating that a "modification will be provided to address the change and a wiring diagram will be provide[d] to show how the fans and dampers are to be controlled" (*id.*).

60. On November 2, 2016, the Corps issued Modification No. A00007 "add[ing] a remote generator annunciator panel and fuel control panel emergency stop to the safe house[,] and . . . provid[ing] a wiring diagram for the generator building exhaust fan and damper controls" (app. supp. R4, tab A6 at H00794-95). The Corps authorized a not-to-exceed price of $65,000 for this change and requested a formal pricing proposal from Healtheon (*id.* at H00795).

61. Throughout December 2016, appellant submitted multiple revised pricing proposals for this work. Healtheon transmitted its final proposal to USACE on January 25, 2017, for $106,782.84. (App. supp. R4, tab A6 at H00844-47)

62. On June 7, 2018, USACE issued unilateral Modification No. A00012 for $86,250.78 in electrical modifications plus a seven calendar-day, non-compensable time extension (R4, tab 16; finding 9).

### *Contaminated Soil*

63. The contract identified certain plots of contaminated soil for disposal at the project site. Specifically, paragraph 3.1.2 of specification 31 23 16.16 12 required appellant to "excavate all contaminated soil as called out on the Contract Drawings. All contaminated soil shall be handled and disposed of in an industrial waste landfill in

accordance with local, state, and federal regulations." (R4, tab 3 at COE001158) The contract price to perform this work was $98,000 (R4, tab 3 at COE000174).

64. Note 3 on Contract Drawing No. C-002 provided:

> SOIL UNDER AND ADJACENT TO EXISTING
> PLATFORM CONTAINS SIGNS OF HYDRAULIC
> FLUID SPILL. SOIL SHALL BE PROPERLY
> REMOVED AND DISPOSED OF IN AN INDUSTRIAL
> WASTE LANDFILL. THE SPILL IS THE FULL
> LENGTH OF THE WEST SIDE OF THE PLATFORM
> (60 FEET), 6 FEET WIDE, AND AN ESTIMATED
> DEPTH OF 1.5 FOOT.

(R4, tab 4 at COE001276) (capitalization in original.)

65. On November 16, 2016, USACE submitted a request for an internal field modification after it determined that the amount of contaminated soil to be removed was greater than what was identified in the contract drawings. The initial estimated cost for an additional 22 cubic yards of work was $48,600. (R4, tab 258 at COE038995)

66. On December 14, 2016, USACE, via Modification No. A00008, directed Healtheon to proceed with this change for the not-to-exceed price of $5,000 (app. supp. R4, tab A6 at H00891-96).

67. In accordance with the government's directed change, Healtheon and its subcontractor, Global Contracting LLC, timely performed the changed work and submitted a pricing proposal in the amount of $30,865.26 (app. supp. R4, tabs A6 at H00901-11, A28 at COE 057984; *see also* tr. 2/168-77).

68. On June 6, 2018, USACE issued unilateral Modification No. A00012 to "Remove Contaminated Soil" for $9,207.13 and 1 calendar day (R4, tab 16 at COE001397-99).

### *Liquidated Damages*

69. The contract incorporated the full text of certain FAR clauses, including FAR 52.211-12, LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000). FAR 52.211-12 includes a blank space that allows contractual parties to fill in an agreed-upon daily liquidated damages rate. With regards to liquidated damages, the contract provided:

14

(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $2,210.00[7] for each calendar day of delay until the work is completed or accepted.

(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

(R4, tab 3 at COE000185-86)

70. It is undisputed that USACE assessed and withheld liquidated damages in the amount of $559,040 from June 30, 2016, through March 20, 2017 (R4, tab 2 at COE000121-22; JSUMF ¶ 12).

### *Request for Equitable Adjustment, Claim, and COFD*

71. On February 26, 2021, appellant submitted a request for equitable adjustment (REA) to the Corps seeking $869,373.56 and a time extension of 294 calendar days (R4, tab 191 at COE 004334). The government never responded to the merits of appellant's REA.

72. On July 23, 2021, appellant submitted a certified claim to the Corps for a contracting officer's final decision (R4, tab 1). Appellant's claim is substantially similar to its REA with the claim amount increased to $870,249.56 (*id.* at COE 00001; R4, tab 191). Notably, appellant's claim does not mention the government's alleged failure to disclose the correct classification for the metal building at the time of contract award or any attempts to misrepresent the correct classification to appellant (*see generally* R4, tab 1).

73. On December 6, 2021, the contracting officer issued a final decision denying appellant's claim in its entirety (R4, tab 2).

74. Healtheon timely filed an appeal at the Board on January 4, 2022, and the appeal was docketed as ASBCA No. 63145.

---

[7] In the contract, the parties highlighted the $2,210 daily rate by writing it in red ink (R4, tab 3 at COE000186) (emphasis in original).

15

75.  The Board conducted a six-day hearing wherein the parties presented six fact witnesses as well as oral testimony from each party's scheduling expert.  Both experts prepared a delay analysis, which included the experts' opinions regarding the causes of delay on the project, responsibility for each delay, and the impact of each delay (R4, tab 262; app. R4 supp., tab A267).

76.  Healtheon's scheduling expert, Mr. Richard Ott, presented extensive testimony at the hearing about his detailed schedule analysis of the project.  Mr. Ott received a Bachelor of Science degree in civil engineering from the University of Missouri, Columbia (app. R4 supp., tab A267 at HE00089).  He subsequently worked as a project engineer and project superintendent for multiple companies in Missouri and Virginia (*id.*).  He holds professional licenses in three states and is a member of the American Society of Civil Engineers and the National Society of Professional Engineers (*id.*).  In his current role as the president of Milestone Consultants, Inc., he prepares and analyzes construction schedules and claims (tr. 3/53-54), the Board accepted Mr. Ott as an expert in construction scheduling and damages analysis (tr. 3/58).

77.  Mr. Ott submitted to the Board an expert report[8] which contained the following conclusions:  (1) the Corps is responsible for 278 days of compensable delay to the project; (2) the Corps is responsible for an additional 94 days of excusable, non-compensable delay; (3) appellant is entitled to $1,214,015.63 in damages for directed changes or differing site conditions that it allegedly encountered at the project site; and (4) appellant is entitled to the remission of $559,040 in liquidated damages withheld by the Corps (app. supp. R4, tab A267a at 2).

---

[8] In his original report, Mr. Ott concluded that the Corps is responsible for 297 compensable days of delay and 75 days of excusable, non-compensable days of delay (app. supp. R4, tab A267 at HE00005).  In addition, Mr. Ott concluded that Healtheon is entitled to $620,498.55 in additional compensation for directed changes or differing site conditions it encountered at the project site, as well as the remission of $559,040.00 in liquidated damages withheld by the Corps (*id.*).  Thereafter, Mr. Ott submitted an updated cost summary that revised all of the aforementioned delay and damage calculations (app. supp. R4, A267a).  Mr. Ott's two-page updated cost summary is confusing, as it presents the new delay and damage calculations in revised tables without much explanation or context (*id.*).  Nevertheless, we will rely solely on the calculations proffered within Mr. Ott's updated cost summary.

78.  Notably, the conclusions contained within Mr. Ott's report directly contradict much of the delay analysis proffered within appellant's certified claim. Although both documents rely upon the same project schedule updates and state that they utilize the same methodology to interpret these documents, the two documents come to significantly different conclusions.  Specifically, while the claim states that appellant delayed progress by 29 days and that the government delayed progress by 325 days, Mr. Ott concludes that the government is responsible for 372 delay days (297 compensable, 75 non-compensable) and that appellant actually sped up project completion by 3 days (R4, tab 1; app. supp. R4, tab 267).  In addition, the claim and Mr. Ott's report sometimes attribute very different sources to alleged delays as well as varied degrees of magnitude to such delays.  For example, if we consider the time period between May 31, 2016, and June 30, 2016, the claim states that the critical path was delayed by 25 days due to issues with the 480V service, while Mr. Ott's report states that the critical path was delayed by 2 days due to issues with discharge pipes and tubing (R4, tab 1 at X; app. supp. R4, tab 267 at X).  We find that these discrepancies greatly reduce the reliability of appellant's expert report and significantly weaken appellant's arguments that rely upon Mr. Ott's delay calculations.

79.  The government presented its scheduling expert, Mr. William Manginelli. Mr. Manginelli received a Bachelor of Science degree with honors from the United States Merchant Marine Academy (R4, tab 262 at COE059410).  Mr. Manginelli began his career at the Corps' Marine Design Center, where he eventually assumed the role of senior project manager (*id.* at COE059411).  More recently, Mr. Manginelli transitioned to the private sector.  After working as a resident construction manager, Mr. Manginelli assumed his current role as president of Trauner Consulting Services (*id.* at COE059410).  He holds several professional memberships, has developed and led countless industry training programs, and has written two editions of a book on construction claims and schedule analysis (*id.* at COE059413-20; tr. 6/8).  The Board accepted Mr. Manginelli as an expert in schedule and delay analysis, and construction damages (tr. 6/11).

80.  Mr. Manginelli submitted an expert report outlining the government's conclusion that appellant has been adequately compensated for any directed changes or differing site conditions that appellant encountered at the project site (R4, tab 262). Specifically, Mr. Manginelli's report cites 39 documents within the record to support his opinion that six of the seven activities at issue did not affect the critical path of the project (*id.* at COE059409).

81.  With the exception of 13 delay days that both experts attribute to the 480 volt service change, Mr. Manginelli asserts that none of the other-directed changes or differing site conditions appellant experienced at the project site delayed the overall completion of the project by delaying the critical path (*id.* at COE059396).

17

82. In addition, Mr. Manginelli determined that (1) Healtheon was the direct cause of at least 264 of the 328 days of delay; (2) of the remaining 64 calendar days, Healtheon was provided 63 days of time extensions; and (3) appellant is entitled to an additional time extension of one day (*id.*).

83. The government provided the Board with multiple graphs that concisely summarize Mr. Manginelli's conclusions, including the table below:

| Responsibility for Delays | | | | | Exhibit T-6 |
|---|---|---|---|---|---|
| Period | Critical Work | Delay During Period | USACE | Time Extension Days Granted | Healtheon |
| 4/30/15 through 11/29/15 | Submittals of Pipe Pile and Generator Building Drawings | 45 | - | 3 | 42 |
| 11/30/15 through 1/11/16 | Submittal of Pre-Engineered Emergency Shelter Building | 13 | - | 7 | 6 |
| 1/12/16 through 3/30/16 | Platform Beams and Slab | 75 | - | - | 75 |
| 3/31/16 through 5/30/16 | Planned Progress | 59 | - | 28 | 31 |
| 5/31/16 through 8/30/16 | Electrical Systems Installation | | | | |
| 8/31/16 through 9/25/16 | Existing 480V Mod | 13 | 1 | 12 | - |
| 9/26/16 through 10/30/16 | Commission/Testing & Demo/Remove Pumps and Equipment | 22 | - | - | 22 |
| 10/31/16 through 3/20/17 | Emergency Building Repairs | 101 | - | 13 | 88 |
| Total | | 328 | 1 | 63 | 264 |

(Gov't br. at 45)

84. Following the hearing of this appeal, the parties engaged in extensive briefing. The appeal is now before the Board for decision.

DECISION

Our analysis is split into three different parts. First, we delve into the merits of appellant's arguments regarding the construction of the metal building. Next, we explore appellant's arguments regarding the alleged defective specifications and differing site conditions encountered at the project site. Finally, we turn to appellant's assertion that it is entitled to the remission of $559,040 in liquidated damages.

18

<u>*Metal Building*</u>

Appellant argues that the government provided defective specifications, breached the duty of good faith and fair dealing, constructively changed the contract, and improperly withheld superior knowledge regarding the generator building. Specifically, appellant alleges that it reasonably interpreted the specifications to support the construction of a fully enclosed building. According to Healtheon, the contract did not contain an express statement of the metal building's enclosure classification. In addition, appellant alleges that the government did not clarify that the building was to be fabricated as a "partially enclosed" structure able to withstand uplift forces until October 2015, halfway through the project. By withholding this information from appellant, Healtheon contends that the government failed to cooperate, delayed the proper fabrication and erection of the building, and ultimately delayed the critical path of the project. For these delays, appellant argues that it is entitled to a 137-day compensable time extension and $197,563.59 of extended overhead. (App. br. at 31-40)

Conversely, the government argues that Healtheon is solely responsible for all delays associated with the metal building. According to the government, appellant did not follow the contract specifications because it did not employ a professional engineer with experience with the ASCE 7 manual to review the metal building specifications in accordance with contract requirements. The government contends that the engineer was required to then make an independent determination of the building enclosure classification and design the building in conformance with that classification. Instead, the government alleges that Healtheon's subcontractor, ABC, relied exclusively on a building enclosure classification contained within a purchase order submitted by Healtheon and that no engineer reviewed the classification during the project. Given this, the government asserts that it cannot be held liable for any delays appellant experienced by deviating from the specifications it received. As such, it requests that the Board disregard appellant's defective specification, superior knowledge, constructive change, and good faith and fair dealing arguments and deny appellant's requests for any time extensions or overhead costs in connection with the construction of the metal building. (Gov't br. at 21-33)

For Healtheon to shift the burden of its extended overhead costs to the government, appellant must establish two things: first, that the government-furnished design specifications were defective, and second, that there is a causative link between the alleged design defect and the additional costs and time that Healtheon spent to correct the defect. *KiewitPhelps*, ASBCA No. 61184, 23-1 BCA ¶ 38,254 at 185,765.

The issue of defective specifications is governed by the *Spearin* doctrine. The *Spearin* doctrine states that "[w]hen the [g]overnment provides specifications directing how a contract is to be performed, the [g]overnment warrants that the contractor will

be able to perform the contract satisfactorily if it follows the specifications." *Hercules Inc. v. United States*, 516 U.S. 417, 425 (1996) (citing *United States v. Spearin*, 248 U.S. 132, 136); *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000) ("When the government provides a contractor with defective specifications, the government . . . breache[s] the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover all of the costs proximately flowing from the breach"). It is well-established that the *Spearin* doctrine's implicit warranty applies to design specifications that permit no deviations in contract performance and that the doctrine does not apply to performance specifications that "merely set forth an objective without specifying the method of obtaining the objective." *White v. Edsall Constr. Co.,* 296 F.3d 1081, 1084 (Fed. Cir. 2002).

In addition, the *Spearin* doctrine does not negate the contractor's duty to investigate or inquire about a patent ambiguity, inconsistency, mistake, or obvious error that the contractor recognized or should have recognized within the specifications. *Id.* at 1085. "A design defect is not sufficiently patent so as to trigger a duty to inquire unless the defect constitutes a 'major patent discrepancy, or obvious omission, or a drastic conflict in provisions'" that would be clearly evident to a reasonable contractor. *KiewitPhelps*, 23-1 BCA ¶ 38,254 at 185,766. As such, contractors are not expected to "ferret out hidden or subtle errors in the specifications" to meet their duty to inquire. *Id.* (citing *Edsall*, 296 F.3d at 1085).

We agree that appellant deviated from the specifications by failing to have an engineer review the contract and determine the appropriate enclosure classification for the metal building. Specification 13 34 19 is entitled "Metal Building Systems" (finding ¶ 12). Paragraph 1.1 states that the work covered by the section includes all operations with the design and fabrication of a metal building system (*id.*). Paragraph 1.4.1 states, "[c]alculations and drawings shall be signed and sealed by a registered professional engineer" (*id.*). In addition, paragraph 1.4.1.2 states that design loads must "[c]onform to the requirements of MBMA MBSM, ASCE/SEI 7, and the building code applicable to the project geographical location" (*id.*). The parties did not provide the Board with a copy of the 2002 ASCE 7 referenced by the specifications, but appellant did provide a copy of the 2006 Metal Building Systems Manual (MBSM), which "focuses on how to apply the loads specified by . . . ASCE 7" and contains a large number of equations from the ASCE 7 manual regarding design loads (finding ¶ 13, n.2).

A cursory review of the 2006 MBSM reveals that the engineer would take the specifications for the metal building and input them into the equations provided within the ASCE 7 manual to determine the appropriate classification for the structure (*id.*). It is undisputed that Healtheon hired the engineering firm Waldemar Nelson Engineering to work with it on the project, but the firm did not review any of ABC's

20

submittals (finding ¶ 16). Further, there is no record evidence that calculations were done by either Healtheon or ABC to support the initial conclusion that the metal building would be fully enclosed (finding ¶ 15). The evidence before the Board indicates that Healtheon failed to conform to the specifications by having a professional engineer review the contract and provide calculations and drawings to support an enclosure classification for the metal building. Given this, we must deny appellant's defective specifications argument.

We reject appellant's other arguments for similar reasons. First, appellant has not proven that the government constructively changed the contract by requiring the metal building to be partially enclosed. A constructive change "arises from the contractor's performance of work 'beyond the contract requirements without a formal order, either by an informal order or due to the fault of the [g]overnment.'" *Tkacz Eng'g, LLC*, ASBCA No. 60358, 18-1 BCA ¶ 36,940 at 179,962 (internal citations omitted). It is well-established that there are four elements that must be satisfied to prevail on a constructive change claim. The first is that the contractor was compelled by the government to perform work not required by the terms of the contract. *Id.* The evidentiary record reveals that appellant was required by the contract specifications to employ a professional engineer well-versed in the ASCE 7 manual to make an independent determination of the metal building's classification and design the building in accordance with that classification (finding ¶ 12). Appellant did not follow these specifications when it classified the building as fully enclosed. Contrary to appellant's contentions, the government merely required appellant to comply with these specifications when it informed appellant that the building should be classified as partially enclosed. As such, appellant has failed to satisfy the first element of the constructive change doctrine, and we must deny appellant's constructive change argument.

Second, appellant has not proven that the government breached its duty of good faith and fair dealing. Breach of such a covenant can be proven in a myriad of ways, including a "lack of diligence and interference with or failure to cooperate in the other party's performance." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988)). Appellant, as the proponent of this claim, bears the burden of proof. "The proper inquiry regarding [this] duty often boils down to questions of 'reasonableness' of the government's actions." *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539. Given that appellant did not comply with the explicit requirements of the contract and the government simply enforced the specifications that both parties agreed to follow, we must conclude that any challenge to the government's duty of good faith and fair dealing regarding the metal building is meritless. As such, we similarly deny appellant's good faith and fair dealing argument.

Finally, to the extent that appellant makes a superior knowledge claim, we do not possess jurisdiction over that claim because it is a new claim that appellant did not present to the contracting officer. *Nassar Grp. Int'l*, ASBCA No. 58451 *et al.*, 19-1 BCA ¶ 37,405 at 181,831. While an appellant may introduce on appeal additional facts that do not alter the nature of the original claim, its appeal must be based upon a common or related set of operative facts to those presented to the contracting officer. *Id.* A claim is new when it "presents a materially different factual or legal theory" of relief. *Id.* (quoting *Lee's Ford Dock, Inc. v. Sec'y of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017). Materially different claims will necessitate a focus on a different or unrelated set of operative facts. *Id.* The theory of superior knowledge is unique in that it normally relies on operative facts in existence before award. *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007) (addressing Board's determinations about the contractor's knowledge during "pre-award period" and "vital knowledge or the opportunity to obtain that knowledge before contract entry.") Specifically, it requires appellant to present facts in the claim relating to a disparity in knowledge between the parties at contract award of which the government was aware. Here, appellant's claim does not mention the government's alleged failure to disclose the correct classification for the metal building at the time of contract award or any attempts to misrepresent the correct classification to appellant (finding ¶ 72). Given this, we must conclude that appellant's superior knowledge claim is a materially different claim than those presented to the contracting officer. Accordingly, we do not have jurisdiction to consider such a new claim.

Although appellant presented various arguments to support the award of additional time and damages in connection with its work on the metal building, the record evidence indicates that appellant did not follow the specifications agreed to by both parties within the contract. As such, we reject appellant's arguments and deny entitlement to additional damages and time extensions for the metal building.

### *Directed Changes*

Appellant also alleges that it is entitled to additional costs as well as time extensions, both compensable and non-compensable, for government-directed changes to seven distinct elements of the project: the gantry crane, metal building louvers, 480V service to the project site, fuel system piping, CO-03 electrical modifications, rip rap, and contaminated soil (app. br. at 27-58). The following chart lays out the time extensions and damages sought for each activity:

| Activity | Compensable Days Sought | Non-Compensable Days Sought | Costs Sought |
|---|---|---|---|
| Gantry Crane | 91 | 11 | $13,428.54 |
| Metal Building Lovers | 12 | 7 | |
| 480V Service | 35 | | $50,472.45 |
| CO-03 Electrical Modifications | 3 | 40 | $81,669.44 ($4,326.21 extended overhead + $77,343.23 direct costs) |
| Fuel System Piping | | | $22,562.68 |
| Rip-rap | | 36 | $19,436.95 |
| Contaminated Soil | | | $21,658.13 |

(App. br. at 27, 45, 49, 51, 57-58; app. reply br. at 8, 20, 23-26)

It is well-established that Healtheon bears the burden of proof to establish that any alleged compensable or non-compensable delay ultimately delayed project completion. Specifically, to demonstrate entitlement for a compensable delay, a contractor must prove: (1) specific delays were attributable to government causes; (2) such delays resulted in delay in completion of the overall project; and (3) the government-caused delays were not concurrent with delays within the contractor's control. *Env't Chem. Corp.*, ASBCA Nos. 59280, 60760, 22-1 BCA ¶ 38,166 at 185,365. To demonstrate entitlement for a non-compensable delay, a contractor must show that (1) the delay resulted from "unforeseeable causes beyond the control and without the fault or negligence of the Contractor" and (2) the unforeseeable cause delayed overall contract completion by affecting the critical path of performance. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000); *see also Ken Laster Co.*, ASBCA Nos. 61292, 61828, 20-1 BCA ¶ 37,659 at 182,855; FAR 52.249-10(b)(1). "Proof of damage is also an element of entitlement and, while mathematical certainty is not required, some proof of damage is required." *L.C. Gaskins Constr. Co.*, ASBCA No. 58550 *et al.*, 18-1 B.C.A. ¶ 36,978 at 180,122.

The government has already accepted partial responsibility for directing additional work and for the existence of differing site conditions in connection with all seven of the aforementioned activities. In response, the government has compensated appellant for portions of the additional work that it and its subcontractors performed to

complete each of the seven activities (gov't br. at 36). Appellant now seeks additional compensation and time extensions to cover its remaining costs and delays.

Appellant has not proven that it is entitled to any additional damages or compensable time extensions. To meet its burden of proof, appellant relies heavily on the oral testimony and expert report of its scheduling expert, Mr. Ott. However, Mr. Ott's conclusions are unpersuasive for two reasons. First, Mr. Ott "corrected" all of his delay and damage calculations in a separate document from his expert report (finding ¶ 77, n.8). This updated cost summary did not outline all of the new allegations of delay and damages in a clear and concise manner with citations to the record evidence (*id.*). Because of this, Mr. Ott's updated cost summary can be boiled down to two revised tables of numbers that are presented without any support or sufficient explanation as to how he arrived at each of his new conclusions. Second, Mr. Ott purports to utilize the same schedule updates and methodology employed in appellant's certified claim to support the analysis set forth within his expert report, but appellant's claim and Mr. Ott's report come to drastically different conclusions regarding the number of alleged days of delay and the claimed causes or magnitude of such alleged delays without explanation for the major discrepancies (finding ¶ 78). These two shortcomings negate appellant's attempts to meet its burden of proof using Mr. Ott's oral testimony and expert report and render the report unpersuasive at best and unreliable at worst.

The evidence reveals that appellant is only entitled to one additional day in non-compensable time extensions for any directed changes or differing site conditions encountered during contract performance. To show that appellant is not entitled to any additional damages and no more than one day in time extensions, the government relies upon the oral testimony and expert report proffered by its scheduling expert, Mr. Manginelli. In his report, Mr. Manginelli cites 39 documents within the record to support his opinion that six of the seven activities at issue did not affect the critical path of the project (finding ¶ 80). In addition, he fairly showcases how the government's actions led appellant to perform additional 480 volt feeder work that requires the government to award appellant one additional day in time extensions. Mr. Manginelli even filled some of the gaps left by appellant's expert testimony and report. Persuaded by Mr. Manginelli's oral testimony and expert report, we must conclude that appellant is only entitled to one additional day of time extensions in connection with additional work performed in connection with the 480V feeder.

We agree with Mr. Manginelli's conclusion that any directed changes appellant encountered at the project site in connection with the gantry crane, the metal building louvers, the emergency shelter building, CO-03 electrical modifications, fuel system piping, rip-rap, and contaminated soil did not affect the critical path of performance. As the graphic table provided by Mr. Manginelli states, the record evidence reveals that there were only eight schedule impacts that affected the critical path:

24

| Period | Critical Work | Delay During Period | USACE | Time Extension Days Granted | Healtheon |
|---|---|---|---|---|---|
| 4/30/15 through 11/29/15 | Submittals of Pipe Pile and Generator Building Drawings | 45 | - | 3 | 42 |
| 11/30/15 through 1/11/16 | Submittal of Pre-Engineered Emergency Shelter Building | 13 | - | 7 | 6 |
| 1/12/16 through 3/30/16 | Platform Beams and Slab | 75 | - | - | 75 |
| 3/31/16 through 5/30/16 | Planned Progress | 59 | - | 28 | 31 |
| 5/31/16 through 8/30/16 | Electrical Systems Installation | | | | |
| 8/31/16 through 9/25/16 | Existing 480V Mod | 13 | 1 | 12 | - |
| 9/26/16 through 10/30/16 | Commission/Testing & Demo/Remove Pumps and Equipment | 22 | - | - | 22 |
| 10/31/16 through 3/20/17 | Emergency Building Repairs | 101 | - | 13 | 88 |
| **Total** | | **328** | **1** | **63** | **264** |

Exhibit T-6 — Responsibility for Delays

(Findings ¶¶ 82-83).

Specifically, these eight impacts were the late submittals of pipe pile and generator building drawings, the late submittal of the pre-engineered emergency shelter building, platform beams and slab, planned progress, electrical systems installation, the existing 480V modification, the commission/testing and demo/removal of pumps and equipment, and repairing defective work that appellant performed on the emergency shelter building (finding ¶ 83). None of these critical work components stem from any directed changes or differing site conditions caused by the government, except the one day of critical work for which the government is responsible in connection with the 480V modification. Instead, the record evidence reveals that Healtheon is responsible for every day of delay it experienced beyond those accounted for in the time extensions totaling 63 days that the government has already provided.

In summary, appellant has not met its burden of proof to show that it is entitled to any additional compensation or time extensions for the directed changes or differing site conditions it encountered in connection with seven of the remaining issues within this appeal: the gantry crane, the metal building louvers, emergency shelter building, CO-03 electrical modifications, fuel system piping, rip rap, and contaminated soil. As such, we deny appellant's requests for additional compensation or time extensions in connection with these seven issues. The record presented contains only evidence to support an additional day in non-compensable time extensions in connection with the work appellant completed on the 480 volt feeder. Given this, we grant appellant a time extension of one day for that work.

*Liquidated Damages*

Finally, we turn to appellant's request for the remission of $559,040 in liquidated damages. It is well established that "the Government bears the initial burden of proving that the contractor failed to meet the contract completion date and that the period of time for which it assessed liquidated damages is correct." *Sauer, Inc.*, ASBCA No. 62395, 21-1 BCA ¶ 37,845 at 183,753 (*citing KEMRON Env'tl Servs. Corp.*, ASBCA No. 51536, 00-1 BCA ¶ 30,664 at 151,399). "Once the government has overcome the initial burden, it is incumbent upon appellant to show either that the government incorrectly assessed the damages under the contract or that appellant's failure to comply with the terms of the contract was excusable." *Derian, Inc.*, ASBCA No. 62957, 23-1 BCA ¶ 38,425 at 186,759 (citing *Chem-Care Co.*, ASBCA No. 53614, 06-2 BCA ¶ 33,427 at 165,726). Here, appellant alleges that its failure to comply with the contract completion date was excusable because of all the directed changes and differing site conditions it encountered at the project.

The contract contains a liquidated damages clause that requires Healtheon to pay $2,210 in liquidated damages for each calendar day of delay until the work is completed or accepted (finding ¶ 69). It is undisputed that USACE assessed and withheld liquidated damages in the amount of $559,040 from June 30, 2016, through March 20, 2017 (finding ¶ 70). The Board has determined that Healtheon was responsible for 264 days of delay, and we are persuaded by Mr. Manginelli's determination that no additional concurrent delays must be granted to appellant. Having determined that Healtheon bears the sole responsibility for 264 days of delay, the government was entitled to collect liquidated damages for those days. As such, the government is entitled to retention of the collected liquidated damages.[9]

## CONCLUSION

Appellant has not proven that it is entitled to any additional compensation in connection with the work it performed under the contract. Appellant has similarly not proven that it is entitled to the remission of any liquidated damages. Appellant is, however, entitled to one additional day of time extensions for its work on the 480-volt feeder.

---

[9] The government has chosen only to assess and withhold $559,0400 for delays between June 30, 2016, and March 20, 2017, but based on our calculation, 264 days of delay x $2,210 per day = $583,440. *See* R4, tab 2 at COE000122.

Therefore, we grant appellant a one-day non-compensable time extension and deny the remainder of the appeal.

Dated: July 24, 2025

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63145, Appeal of Healtheon, Inc., rendered in conformance with the Board's Charter.

Dated: July 24, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals